IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| PHILIP HAYES, #B88878, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-cv-944-RJD |
| | ) | |
| DEE DEE BROOKHART, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

**DALY, Magistrate Judge:**

Plaintiff Philip Hayes, an inmate of the Illinois Department of Corrections ("IDOC"), filed the instant lawsuit pursuant to 42 U.S.C. § 1983 for an alleged deprivation of his constitutional rights at Lawrence Correctional Center.  (Doc. 1).  Plaintiff alleges that Defendants failed to provide adequate mental healthcare following the death of his great aunt, in violation of his Eighth Amendment rights, forcing him to declare a hunger strike for adequate treatment.  (*Id.* at 10-11; Doc. 13 at 12-13).   Plaintiff further alleges that Defendants retaliated against his hunger strike by issuing disciplinary tickets followed by sham adjudicative review proceedings, thus infringing on his First Amendment rights and due process rights under the Fourteenth Amendment.   (Doc. 1 at 10-16).

After the threshold review, Plaintiff was allowed to proceed on the following claims:

Count 1:   Eighth Amendment deliberate indifference to serious medical/mental health needs claim against Crawford and Gibbs for denying Plaintiff mental health care on November 29, 2019.

Count 2:   First Amendment claim against Crawford, Brookhart, and Young for issuing false disciplinary tickets to Plaintiff in retaliation for Plaintiff

complaining about his conditions of confinement by going on a hunger strike regarding the denial of his requests for mental health care on November 29, 2019.

Count 3:    First Amendment claim against Williams and Mayberry for finding Plaintiff guilty of false disciplinary tickets and against Williams, Mayberry, and Brookhart for punishing Plaintiff on false disciplinary tickets in retaliation for Plaintiff complaining about his conditions of confinement by going on a hunger strike regarding the denial of his requests for mental health care on November 29, 2019.

Count 4:    Fourteenth Amendment due process claim against Crawford, Brookhart, Young, Williams, and Mayberry for their participation in sham disciplinary proceedings.

(Doc. 13).   Defendants filed a motion for summary judgment (Doc. 40) that is now before the Court.   Plaintiff did not file a response.   For the reasons set forth below, Defendants' motion is **GRANTED in part and DENIED in part**.

## Background

Plaintiff made the following allegations in the Complaint (Doc. 1): After receiving news of the death of a loved one, Plaintiff asked to speak to someone in the mental health department on November 29, 2019.   He was in "a dark place and bad state of mind." (*Id.*, p. 10).   He first spoke with Correctional Officer Crawford, who denied his request.   He then spoke with Correctional Officer Gibbs who also denied his request.   Because Crawford and Gibbs refused his requests, Plaintiff declared a hunger strike.   The next morning, Crawford came to Plaintiff's cell and told him that if he did not stop his hunger strike, he would be given a ticket for dangerous disturbance and security threat group.   Crawford stated that Warden Brookhart and Internal Affairs Officer Joshua Young were already creating an incident report to make it appear as if he and five other inmates had gone on a hunger strike together.   A few days later, Plaintiff was given disciplinary tickets for dangerous disturbance and security threat group.

A hearing was held on Plaintiff's disciplinary tickets by Lieutenant Darren Williams and Correctional Officer Shanae Mayberry.   Williams told him, "Look kid I don't care about right or wrong, nor do I care about one of you love ones dying or for the truth in this matter. All I know is Warden Brookhart wants your ass and I'm going to deliver it to her." (*Id.*, p. 12).   When Plaintiff asked Mayberry to intervene, she responded, "I'm just going with the flow, I get paid to do as I'm told not what's right." (*Id.*) Plaintiff was found guilty and given six months of disciplinary segregation, C-grade, and contact visit restriction along with a transfer to the worst IDOC facility – Pontiac Correctional Center ("Pontiac").   Warden Brookhart signed off on the disciplinary action despite knowing the allegations were false.

Plaintiff never received the mental health care that he needed.   After he was transferred to Pontiac, he was unable to sleep, had urine and feces thrown in his face, attempted suicide "by cut at my AC, by arson, and hanging with a rope around my neck from the bars of my cell," and had property taken from him. He was forced to live in cells without running water, a light that could not be turned off, and a non-working toilet full of human waste.   He suffered from severe depression, anxiety attacks, hallucinations, and nightmares.

Plaintiff wrote a grievance explaining his reasons for his hunger strike. When the grievance was reviewed at the second level, Warden Brookhart had a chance to take corrective action but instead concurred with the officers' false allegations.   On July 21, 2020, the ARB issued its decision recommending that the disciplinary report be expunged.   (Doc. 1, pp. 14, 17) IDOC Director Jeffreys concurred.

**Findings of Facts**

Defendants submitted a statement of undisputed material facts with proper citation to the record attached to the same.   (Doc. 41, at 2-6).   Plaintiff did not file a response to the motion to dispute Defendants' factual allegations or submit a separate statement of facts.   In accordance with Local Rule 56.1 (g), the following facts set forth in Defendants' Statement of Material Facts are deemed admitted.

At all times relevant to the complaint, Plaintiff was incarcerated at Lawrence Correctional Center in disciplinary segregation.   (Doc. 41 at 2; Doc. 41-1, 37:3-23).   Approximately a week prior to November 29, 2019, Plaintiff received news that his aunt, his grandmother's sister, had passed away.   (Doc. 41 at 2; Doc. 41-1 at 39:22-25).   On November 20, 2019, Plaintiff was visited during Mental Health Segregation Rounds, where it is noted that he said he was "not trying to talk."   (Doc. 41 at 2; Doc. 41-2 at 35).   On November 23, 2019, Plaintiff was evaluated for suicide potential.   The results indicated a low risk of suicide potential and no crisis status was ordered.   (Doc. 41 at 3; Doc. 41-2 at 27-30).   On November 24, 2019, Plaintiff attended a two-hour group therapy session where he was observed in a "good" mental state, interacting with group members appropriately and positively, and where he did not report having homicidal, self-harming, or suicidal thoughts.   (Doc. 41 at 3; Doc. 41-2 at 31).   On November 27, 2019, at around 9:16 a.m., Plaintiff was visited again during Mental Health Segregation Rounds where it is noted that he said, "I'm alright."   (Doc. 41 at 3; Doc. 41-2 at 33).   On November 27, 2019, Plaintiff attended another two-hour therapy session, between 12:30 p.m. and 2:30 p.m., where he was observed engaging positively, didn't report any harmful thoughts, and identified as "straight and good." (Doc. 41 at 3; Doc. 41-2 at 32).   On November 28, 2019, Plaintiff was seen at 9:20 a.m. by a nurse

for issues relating to dandruff and back pain.   There is no mention of any other issue in the reports. (Doc. 41 at 3; Doc. 41-3 at 1-4).

On November 29, 2019, Plaintiff spoke to Defendant Crawford and Gibbs, requesting to see a mental health professional.   Plaintiff was instructed to put in a written request to see a mental health professional.   (Doc. 41 at 3; Doc. 41-1 at 41:8-24).   At approximately 10:20 a.m. on November 29, 2019, Plaintiff declared a hunger strike to Defendant Gibbs.   Plaintiff's hunger strike report indicates that Plaintiff did not provide a reason for beginning his hunger strike.   (Doc. 41 at 3; Doc. 41-4 at 1).   Plaintiff maintains that he ended his hunger strike on the evening of November 29, 2019, by accepting his dinner tray.   (Doc. 41 at 4; Doc. 41-1at 57:8-16).

On November 30, 2019, Defendant Young issued a disciplinary report against Plaintiff for two counts: (1) Dangerous disturbance and (2) Security Threat Group or Unauthorized Organizational Activity.   In his report, Defendant Young states that he entered the A-Wing of Segregation and discovered that six offenders had declared hunger strike at the same time. Interviewing confidential sources, Defendant Young determined that the hunger strikes were an organized protest against the Segregation Wing's restriction from access to the Christmas shop. Plaintiff was one of three inmates identified by two confidential sources as a leading voice behind the protest.   Plaintiff was served with the disciplinary report on December 2, 2019, at 10:16 p.m., but refused to sign. (Doc. 41 at 4; Doc. 43-1 at 247-48).

On December 2, 2019, Plaintiff participated in a twenty-five-minute group therapy session. Plaintiff was noted as a continued disruption in the group, uncooperative, and having an inappropriate attitude throughout the group's duration.   Plaintiff didn't report homicidal, suicidal, or self-harming thoughts.   (Doc. 41 at 4; Doc. 41-2 at 37).

On December 4, 2019, Plaintiff attended an Adjustment Committee hearing regarding his disciplinary report issued on November 30, 2019.   Defendants Williams and Mayberry were present as chairs of the hearing committee.   Upon review of the disciplinary report, plaintiff pled not guilty to all charges.   Plaintiff further stated he was the only person who went on hunger strike on first shift and that he started his hunger strike on November 29, 2019.   Furthermore, Plaintiff stated that he was doing his "own thing" for his "own reasons."   Officer Young was called by the Lawrence C.C. Adjustment Committee and was present to verify the reliability of the confidential witnesses.   Plaintiff was found guilty of all charges and was issued a final disciplinary action on December 10, 2019, by Defendant Brookhart including the following: Six (6) Months C-Grade Designation; Six (6) Months Segregation; A Disciplinary Transfer; and Six (6) Months Contact Visits Restriction.   (Doc. 41 at 4; Doc. 43-1 at 245-246).

On December 5, 2019, a grievance counselor received Plaintiff's Grievance 12-19-133, dated November 29, 2019.   Plaintiff's grievance stated that he had spoken with mental health professional Flatly about getting a "one on one" to discuss a death in his family.   The grievance stated that he spoke to Ms. Flatly sometime between 12:30 p.m. and 1:15 p.m. on November 29, 2019, and that Ms. Flatly failed to file the proper paperwork so that he could be seen by an MHP, leading to Plaintiff going on hunger strike.   (Doc. 41 at 5; Doc. 41-6 at 382-383).

Plaintiff refused mental health services and group therapy between December 2, 2019, and December 10, 2019.   (Doc. 41 at 5; Doc. 41-2 at 38-44 and 46-47).   On December 10, 2019, at 4:00 p.m., Plaintiff was seen individually by a clinician after asking to see a crisis team member. Plaintiff reported that he was not homicidal or suicidal and that he went on hunger strike due to a death in the family, not STG activity.   (Doc. 41 at 5; Doc. 41-2 at 45).   Between December 11,

2019, and Plaintiff's transfer to Pontiac in late December 2019, Plaintiff consistently refused mental health services and attended group therapy only once.   (Doc. 41 at 5; Doc. 41-2 at 52-62).

On January 21, 2020, the Administrative Review Board received Plaintiff's grievance dated January 5, 2020, in which Plaintiff stated that he had gone on a hunger strike to get the attention of a mental health professional regarding the loss of a relative.   (Doc. 41 at 5; Doc. 43-1 at 204-205).   Plaintiff requested that his disciplinary action be expunged because he was not a part of the hunger strikes on November 30, 2019.   (Doc. 41 at 5; Doc. 43-1 at 204-205).   On July 21, 2020, the Administrative Review Board reviewed Plaintiff's disciplinary ticket and ultimately ordered expungement of the November 30, 2019, disciplinary report.   (Doc. 41 at 6; Doc. 43-1 at 196).   Plaintiff received numerous other disciplinary tickets and actions prior to and after the November 30, 2019, disciplinary ticket.   (Doc. 41 at 6; Doc. 41-7 at 1-8).   Plaintiff served time in segregation for other disciplinary actions.   (Doc. 41 at 6; Doc. 41-7 at 1-8).   Expungement of the ticket removed the disciplinary actions from Plaintiff's record.   (Doc. 41 at 6; Doc. 41-7 at 1-8).

**Plaintiff's Deposition**

Exercising its discretion under Federal Rule of Civil Procedure 56(c)(3), the Court further considers the following portions of Plaintiff's deposition.   FED. R. CIV. P 56(c)(3).   Plaintiff testified that the day he became aware of his grand aunt's death, he submitted a written request to see a mental health care provider, but he did not receive a response.   (Doc. 41-1 at 12).   In the following days, he would yell from his cell, which was at the end of his wing, so that the correctional officers at the front of his gallery, Defendants Crawford and Gibbs, would hear him and go talk to him regarding his mental health request, but to no avail.   (*Id.*)   Plaintiff

acknowledged that he had everyday contact with the nurse who administered his medication.   (*Id.*)
Even though the nurse was trained for a crisis mode, Plaintiff did not ask the nurse for mental
health treatment because he was not suicidal, homicidal, or in a crisis mode; he just wanted to talk
to a mental health care provider about losing a loved one.   (*Id.*).

Plaintiff further testified that the reason he went on a hunger strike was to force the people
he "was trying to talk to," the mental health professionals, nurse, lieutenants, and even the warden
to talk to him.   (Doc. 41-1 at 14).   While he acknowledged he was not in crisis mode, suicidal or
homicidal, he argued that the prison should have arranged for him to see a mental health care
professional because people who are "in a dark place" because "a family member just died" are at
risk of self-harm.   (*Id.* at 13-14).

On November 30, 2019, Defendant Young visited Plaintiff to question him about the
ongoing hunger strike and his affiliation with the other inmates who had gone on hunger strike.
(Doc. 41-1 at 16-17).    Plaintiff informed Young that his hunger strike was unrelated to the other
inmates' orchestrated hunger strike.   (*Id.* at 18).   Plaintiff further referred Young to the incident
report Gibbs had prepared, which allegedly listed the death of a family member as a basis for
Plaintiff's hunger strike.   (*Id.* at 18).   Young responded that he had no access to the report
because it was forwarded to "the nurses or somebody like that."   (*Id.* at 18-19).   Plaintiff testified
that Young issued the erroneous disciplinary ticket because he believed Plaintiff went on a hunger
strike at the same time as everybody else and because he failed to conduct a proper investigation
and review Plaintiff's hunger strike report, which allegedly documented Plaintiff's stated reason
for his hunger strike as well as the fact that he initiated his hunger strike a shift earlier than the
other inmates.   (*Id.* at 22).   Plaintiff further testified that when the erroneous disciplinary ticket

was delivered to him, the correctional officer, whom Plaintiff did not identify as one of the Defendants, did not provide him with any writing utensils to list his requested witnesses.   (Doc. 41-1 at 19).   Plaintiff verbally asked the unknown correctional officer for two witnesses: Defendant Gibbs and Plaintiff's cellmate, who was present when Plaintiff reported the reason for his hunger strike to Gibbs.   (*Id.* at 19-20).   The unknown correctional officer responded that Defendant Gibbs's testimony would not be needed because they already had his statement.   (*Id.* at 19).   Plaintiff testified that the members of the Adjustment Committee, Defendants Mayberry and Williams, found him guilty based on Defendant Young's erroneous investigative report and that during the disciplinary hearing, Defendant Mayberry told him that "the warden went on with everybody involved in this" and "they want this to happen and this is what they're going to make sure happens."   (Doc. 41-1 at 22-23).

Plaintiff testified that the following disciplinary actions were imposed on him as a result of the hunger strike: disciplinary transfer to Pontiac, a maximum-security prison, six months in segregation, and six months of audio-visual and visitor restrictions.   (Doc. 41-1 at 20).   He was also downgraded to C grade, which restricted access to hygiene only once a month and resulted in further restrictions on commissary and the use of the phone.   (*Id.*).   While in segregation, Plaintiff testified that his mental health deteriorated.   (Doc. 41-1 at 21).   He was sleep-deprived, had "feces throw[n] in [his] face," became suicidal, and was on crisis watch.   (*Id.*).   While the ticket was expunged from his record on July 21, 2020, Plaintiff testified that by that time, he had already been transferred to Pontiac and had already served his full sentence imposed for the hunger strike disciplinary ticket, including the visitation restrictions.   (*Id.*).

### Summary Judgment Standard

Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248). In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

The Seventh Circuit has stated that summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events. *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (other citations omitted)). The moving party bears the initial burden of producing evidence that identifies those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes to demonstrate the absence of a genuine issue of material fact. *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (quoting *Logan v. Commercial Union Ins.*

*Co.*, 96 F.3d 971, 978 (7th Cir. 1996)).   After the moving party has satisfied its burden to establish that no genuine issue of material fact exists, the burden shifts to the non-moving party to set forth specific facts showing there is a genuine issue for trial.   FED. R. CIV. P. 56(e)(2).   The non-moving party may not rely merely on allegations or denials in its own pleading.   *Id.*   The opposing party must, instead, go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial.   *Celotex*, 477 U.S. at 324.   The court needs to consider only the cited materials but, at its discretion, may also consider materials in the record that have not been cited in the parties' briefs.   FED. R. CIV. P. 56(c)(3).

<u>Discussion</u>

**Count 1:**      ***Eighth Amendment deliberate indifference to serious medical/mental health needs claim against Crawford and Gibbs for denying Plaintiff mental health care on November 29, 2019.***

The crux of Plaintiff's complaint in Count 1 is that Defendants Gibbs and Crawford violated his constitutional rights under the Eighth Amendment on November 29, 2019, when they denied him access to a mental health care professional for the loss of his aunt of which he had become aware a week earlier.   (Doc. 1, pp. 18-19).   Plaintiff acknowledges that on November 29, 2019, he was not in a crisis mode, suicidal or homicidal.   (Doc. 41-1 at 13-14).   He argues, however, that Defendants should have still arranged for him to see a mental health care professional because people who are "in a dark place" due to the death of a family member are at risk of self-harm.   (*Id.*).

The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment.   *Estelle*

*v. Gamble*, 429 U.S. 97, 104 (1976).[1]   In order to prevail on such a claim, Plaintiff must show first that his condition was "objectively, sufficiently serious and a substantial risk to his or her health or safety" and second that "the individual defendants were deliberately indifferent to the substantial risk to the prisoner's health and safety."   *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006) (citation omitted).

A serious medical need for the purposes of an Eighth Amendment claim of deliberate indifference "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Foelker v. Outagamie Cnty.,* 394 F.3d 510, 512-13 (7th Cir. 2005).   A medical condition that is not life-threatening can still be serious if it "would result in further significant injury or unnecessary and wanton infliction of pain if not treated."   *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir.2010).   The need for treatment of a mental illness "could certainly be considered a serious medical need."   *Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir. 2001).   The Seventh Circuit has held that self-harming or suicidal behavior is a "serious medical condition."   *See Daniels v. Klemmer*, 404 F. Supp. 3d 1223, 1229 (E.D. Wis. 2019) (citing *Pittman ex rel. Hamilton v. County of Madison*, Ill., 746 F.3d 766, 775 (7th Cir. 2014) (abrogated on other grounds)).   At the same

---

[1] While the Eighth Amendment protects inmates from being subjected to conditions imposing a substantial risk of serious harm, including self-harm and suicide, Plaintiff does not have a claim on that basis.  *See Estate of Miller, ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 989 (7th Cir. 2012).   To prevail on a claim for deliberate indifference to serious risk of self-harm or suicide, the plaintiff must show that the prison officials "knew of a significant likelihood that the inmate would *imminently* attempt" self-harm or suicide and that they "failed to take reasonable steps to prevent it."   *Davis-Clair v. Turck*, 714 Fed. Appx. 605, 606 (7th Cir. 2018) (emphasis added).   "A risk of self-harm or suicide must be sure or very likely to give rise to sufficiently imminent dangers before an official can be liable for ignoring that risk."   *Id.* (citation and internal quotation marks omitted).   Here, not only did Plaintiff testify that on November 29, 2019, he was not suicidal or in crisis mode, but further has not alleged that he attempted suicide or self-harm as a result of Plaintiff's failure to provide him with immediate medical treatment, thus precluding an Eighth Amendment Claim for failure to prevent harm.

time, "[m]ental illness, including suicidal ideation, comes in many degrees of severity," which in turn may differentiate the urgency for treatment.   *See Miller v. Harbaugh*, 698 F.3d 956, 963 (7th Cir. 2012).

Here, the record shows that Plaintiff had been diagnosed with issues such as PTSD, APSD, and a THC/Methamphetamine use disorder, which all could amount to a serious medical need. (Doc. 41-2 at 1).   However, Plaintiff does not allege that he was denied medical care for his diagnosed medical conditions.   Rather, he claims that on November 29, 2019, Defendants denied him access to mental health care regarding the death of his auntie, of which he had become aware approximately a week earlier.   While the death of a loved one can potentially lead to an objectively sufficiently serious health condition, here, the record does not support a finding that Plaintiff, in fact, was experiencing such a condition.   Plaintiff testified that on November 29, 2019, he was not homicidal, suicidal, or considering self-harm, and he didn't consider his condition crisis-worthy.   Plaintiff's medical record shows that between the time he became aware of his grand-aunt's death and November 29, 2019, when Defendants Crawford and Gibbs allegedly denied him access to mental health care, Plaintiff had attended two two-hour therapy sessions.   At both sessions, the mental health care professionals confirmed Plaintiff was in a "good" mental state, he was interacting with group members appropriately and positively, and he did not report having homicidal, self-harming, or suicidal thoughts.   (Doc. 41-2 at 31-32).   Plaintiff's good mental state was further confirmed by his evaluation for suicide potential on November 23, 2019, which showed a low risk of suicide that did not warrant a crisis status, (Doc. 41-2 at 27-30), as well from the reports of the Mental Health Segregation Rounds on November 20, 2019, and November 27, 2019, which showed that Plaintiff did not express any concerns about his mental

health (Doc. 41-2 at 33-35).   Plaintiff was further visited by the nurse who was administering his medication on a daily basis, yet he did not communicate to her any concerns about his mental health.

Even more, in his deposition, Plaintiff did not articulate specifically the mental health symptoms he was experiencing on November 29, 2019.   Rather, he merely argued that people "in a dark place" due to the death of a family member could possibly harm themselves.   (Doc. 41-1, 52:15-53:8).   A mere speculation as to what can potentially happen to a person experiencing the loss of a loved one is insufficient to establish an Eighth Amendment claim.   *See Crawford v. Kalahan*, 12-CV-1101-JPG, 2012 WL 6016897, at *2 (S.D. Ill. Dec. 3, 2012) (holding that Plaintiff's speculation that he "could have" experienced medical issues such as diabetes or high blood pressure as a result of hunger strike was insufficient to make out a colorable Eighth Amendment claim).   Accordingly, based on the record, no reasonable jury could conclude that on November 29, 2019, when Defendants Gibbs and Crawford allegedly denied Plaintiff access to mental health care, Plaintiff was suffering from an objectively sufficiently serious medical need as a result of the death of his grant-aunt approximately a week earlier.

Even assuming, *arguendo*, that Plaintiff's mental health had deteriorated to a degree amounting to a serious medical condition, Plaintiff's claim also fails to show that Defendants Gibbs and Crawford were deliberately indifferent to such serious medical need.   "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain.'"   *Estelle*, 429 U.S. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).   "The infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense."   *Duckworth v.*

*Franzen*, 780 F.2d 645, 652-53 (7th Cir. 1985).   Negligence, gross negligence, or even recklessness, as that term is used in tort cases, is not enough.   *Id.* at 653; *Shockley v. Jones*, 823, F.2d 1068, 1072 (7th Cir. 1987).   Put another way, the plaintiff must demonstrate that the officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the officials actually drew that inference.   *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).   A factfinder may also conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.   *Id.* (internal quotations omitted).   The Court examines the totality of the medical care provided, and isolated incidents of delay do not rise to the level of deliberate indifference.   *See Walker v. Peters*, 233 F.3d 494, 501 (7th Cir.2000); *Gutierrez v. Peters*, 111 F.3d 1364, 1374–75 (7th Cir.1997).   The Seventh Circuit has remarked that the significance of a delay in the medical treatment depends "on the seriousness of the condition and the ease of providing treatment."   *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010).   In order to establish a deliberate indifference claim of delayed treatment, a prisoner "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment."   *Thomas v. Walton*, 461 F. Supp. 2d 786, 793 (S.D. Ill. 2006) (quoting *Langston v. Peters*, 100 F. 3d 1235 at 1240).

Here, the record shows that Plaintiff was offered, but refused, mental health services and group therapy between December 2, 2019, and December 10, 2019, just a few days following his verbal requests to Defendants Gibbs and Crawford.   (Doc. 41 at 5; Doc. 41-2 at 38-44 and 46-47).   On December 10, 2019, at 4:00 p.m., Plaintiff was seen individually by a clinician after asking to see a crisis team member.   Plaintiff reported that he was not homicidal or suicidal and that he went on a hunger strike due to a death in the family, not STG activity.   (Doc. 41 at 5; Doc.

41-2 at 45).   Between December 11, 2019, and Plaintiff's transfer to Pontiac in late December 2019, Plaintiff consistently refused mental health services and attended group therapy only once. (Doc. 41 at 5; Doc. 41-2 at 52-62).   Even construing the record most liberally for Plaintiff, there is simply no evidence to support the position that the three-day delay in getting access to mental health treatment had a detrimental effect on his mental health.   Accordingly, Defendants Crawford and Gibbs are entitled to summary judgment as to Count 1 of the complaint.   Because the Court finds Defendants did not violate Plaintiff's constitutional rights, it need not consider Defendants' alternative argument on the basis of qualified immunity.

*Count 2:*      *First Amendment claim against Crawford, Brookhart, and Young for issuing false disciplinary tickets to Plaintiff in retaliation for Plaintiff complaining about his conditions of confinement by going on a hunger strike regarding the denial of his requests for mental health care on November 29, 2019.*

*AND*

*Count 3:*      *First Amendment claim against Williams and Mayberry for finding Plaintiff guilty of false disciplinary tickets and against Williams, Mayberry, and Brookhart for punishing Plaintiff on false disciplinary tickets in retaliation for Plaintiff complaining about his conditions of confinement by going on a hunger strike regarding the denial of his requests for mental health care on November 29, 2019.*

A prison official who takes action in retaliation for a prisoner's exercise of a constitutional right violates the Constitution.   *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000).   The Seventh Circuit has articulated that for a plaintiff to prevail on a First Amendment retaliation claim, he must show that: (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was "at least a motivating factor" in the defendant's decision to take the

retaliatory action. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (citing *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)) (other citations omitted).

 At the summary judgment stage, the Seventh Circuit has held that the burden of proving causation is split between the parties. *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012). Initially, in order to establish a prima facie case, the plaintiff must produce evidence, direct or circumstantial, that his speech was at least a "motivating" factor in the defendant's decision to take retaliatory action. *Id.* Circumstantial evidence can include "suspicious timing, ambiguous oral or written statements, or behavior towards or comments directed at" the plaintiff. *Kidwell*, 679 F.3d 965 (citing *Long v. Teachers' Retirement Sys. of Ill.*, 585 F.3d 344, 350, (7th Cir.2009)). However, suspicious timing, in and on itself, will "'rarely be sufficient" to establish causation for purposes of summary judgment unless the plaintiff can demonstrate that the adverse action "follows close on the heels of protected expression," and there is evidence that the defendant was aware of the protected conduct. *Id.* (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir.2005; *Lalvani v. Cook Cnty.*, 269 F.3d 785, 790 (7th Cir.2001) (internal citation omitted)). Thus, the court will typically not infer causation solely on the basis of suspicious timing unless there is only a few days lapse between the protected activity and the adverse action. *Id.* Once the plaintiff meets his burden, the burden shifts to Defendants to show that the harm would have occurred anyway. *Greene v. Doruff,* 660 F.3d 975, 979 (7th Cir. 2011). If the defendant fails to counter the plaintiff's evidence, then the defendant's retaliatory actions are considered a "necessary condition" of the plaintiff's harm, and the plaintiff has established the "but-for" causation needed to succeed on his claim. *Kidwell*, 679 F.3d at 965.

 Defendants first argue that because Plaintiff's disciplinary report for the orchestrated

hunger strike was expunged on July 21, 2020, and was removed from Plaintiff's record, Plaintiff cannot satisfy the second element of a First Amendment retaliation claim, that is that Plaintiff suffered a deprivation that would likely deter his First Amendment activity in the future.  (Doc. 41 at 15).  A deprivation is likely to deter a First Amendment activity when the purported retaliatory conduct "would likely deter a person of ordinary firmness from continuing to engage in protected activity."  *Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011).   In his deposition, Plaintiff testified that the following disciplinary actions were imposed on him as a result of the hunger strike: disciplinary transfer to Pontiac, a maximum-security prison, six months in segregation, and six months of audio-visual and visitor restrictions.  (Doc. 41-1 at 20).  He was also downgraded to C grade, which restricted access to hygiene only once a month and resulted in further restrictions on commissary and the use of the phone.  (*Id.*).   While in segregation, Plaintiff testified that his mental health deteriorated.  (Doc. 41-1 at 21).  He was sleep deprived, he had "feces throw[n] in [his] face," became suicidal, and was on crisis watch.  (*Id.*).  Viewing these facts in Plaintiff's favor and from the perspective of a person of "ordinary firmness," the deprivation in this case was sufficient to deter future First Amendment activity.  *See Cullum v. Godinez*, No. 3:14-cv-00012-SMY-PMF, 2016 WL 304865, at *1 (S.D. Ill. Jan. 25, 2016) (explaining that a jury could find that the plaintiff had suffered a deprivation likely to deter future protected activity where he spent thirty days in segregation unit, lost gym and yard privileges for thirty days, lost access to commissary privileges for thirty days, had his security level demoted, and lost some personal items)).   The fact that the disciplinary ticket was later expunged (after the sanctions had been served and without evidence of the served time being credited to a subsequent sentence) does not change this conclusion.

Defendants next argue that Plaintiff's alleged First Amendment activity was not a motivating factor in the issuance of the disciplinary ticket.   (Doc. 41 at 15-16).   They argue that Plaintiff's time in segregation was warranted as a result of other disciplinary tickets and actions prior to and after the November 30, 2019, disciplinary ticket.   Defendants cite Plaintiff's Disciplinary History report from 1/1/1998 through 4/5/2022, which lists the disciplinary tickets Plaintiff was issued for the relevant period, the dates and description of each incident, and the respective disciplinary action imposed on Plaintiff.   (Doc. 43-1).   Defendants' general citation to Plaintiff's Disciplinary History report falls short of carrying their burden to show that Plaintiff's transfer to Pontiac in late December 2019 and the approximately six months he spent in segregation would have occurred even if Plaintiff had not been issued the November 30, 2019, disciplinary ticket.   It is unclear whether Plaintiff had already served his time in segregation for the other disciplinary tickets that are listed on Plaintiff's Disciplinary History report.   Further, Defendants do not specifically indicate for which of the listed disciplinary tickets Plaintiff was moved to Pontiac in late December 2019 and served approximately six to eight months in segregation. Drawing all reasonable inferences in the light most favorable to Plaintiff, the Court cannot conclude that no reasonable jury could find that the time Plaintiff spent in segregation in Pontiac was not, at least in part, a disciplinary action for Plaintiff's alleged participation in the orchestrated hunger strike.

**Qualified Immunity**

In their motion, Defendants assert that they are entitled to summary judgment on Counts 2 and 3 of the Complaint on the basis of qualified immunity because there is no clearly established right to hunger strike under the First Amendment.   (Doc. 41, 19-23).   "The doctrine of qualified

immunity protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Birdo v. Dave Gomez*, 214 F. Supp. 3d 709, 717 (N.D. Ill. 2016) (citation and internal quotation marks omitted).   To determine whether a right is clearly established, the Court must follow a three-step analysis. *Id.*   The Court first looks to controlling precedent from the Supreme Court and the Seventh Circuit. *Id.* at 717-18 (quoting *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000)).   Absent a controlling precedent, the Court then expands its inquiry to all relevant case law to determine "whether there was such a clear trend" to support "with fair assurance" a finding that "the recognition of the right by a controlling precedent was merely a question of time." *Id.* at 718 (quoting *Denius*, 209 F.3d at 950) (internal citation and quotation marks omitted).   "A split among courts regarding the constitutionality of conduct analogous to the conduct in question is an indication that the right was not clearly established at the time of the alleged violation." *Id.* (quoting *Denius*, 209 F.3d at 951) (internal quotation marks omitted). Finally, in "rare cases, where the constitutional violation is patently obvious, the plaintiff may not be required to present the court with any analogous cases, as widespread compliance with a clearly apparent law may have prevented the issue from previously being litigated." *Id.* (quoting *Denius*, 209 F.3d at 951) (internal quotation marks omitted).

Controlling precedent has long held that some, but not all, forms of expressive conduct fall within the protection of the First Amendment.   *See Birdo*, 214 F. Supp. 3d at 717 (citing *Texas v. Johnson*, 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (internal citation omitted) (noting that the First Amendment's protection "does not end at the spoken or written word" but rejecting the view of "an apparently limitless variety of" expressive conduct being labeled

'speech'); *United States v. Hayward*, 6 F.3d 1241, 1249 (7th Cir. 1993), *overruled on other grounds by United States v. Colvin*, 353 F.3d 569 (7th Cir. 2003) (holding that protect cross burning used to intimidate is not protected "speech" under the First Amendment because it promotes fear, intimidation, and psychological injury); *United States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) ("We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea.")).   Narrowing down the inquiry on the specific expressive conduct at issue, "neither the Supreme Court nor the Seventh Circuit has directly discussed" whether prisoner hunger strikes is an expressive conduct protected under the First Amendment. *Birdo*, 214 F. Supp. 3d at 718.

The Court's inquiry into other relevant case law does not reveal any clear trend showing "with fair assurance" that recognition of an inmate's right to hunger strike is merely a matter of time.   The District Court for the Northern District of Illinois specifically dealt with that issue in *Birdo*.   *See Birdo*, 214 F. Supp. at 718-20.   There, a former state inmate brought an action under Section 1983, asserting, *inter alia*, a First Amendment retaliation claim against correctional officers for imposing on him "unfair discipline" in retaliation of the plaintiff initiating a hunger strike.   *Id.*   Collecting relevant case law spanning from 1998 through 2014, where courts reached inconsistent holdings on that issue, the court held that the correctional officer defendants were entitled to qualified immunity because prisoner hunger strikes were not clearly protected speech at the time.   *Id.* (collective citation omitted).   The court emphasized that the split had extended even within the Seventh Circuit, with courts issuing two inconsistent holdings within the two years immediately preceding the case at issue.   *Id.* (comparing *Gevas v. Ryker*, No. CIV. 10–493–MJR,

2011 WL 711078, at *5 (S.D. Ill. Feb. 22, 2011), *on reconsideration in part on other grounds*, No. 10–CV–493–MJR–SCW, 2011 WL 1458075 (S.D. Ill. Apr. 15, 2011) (finding that the prisoner plaintiff's declaration of a hunger strike sufficiently described protected activity to support a 42 U.S.C. § 1983 retaliation claim at the preliminary review of the complaint pursuant to 28 U.S.C. § 1915A); with *Crawford v. Kalahan*, No. 12–CV–1101–JPG, 2012 WL 6016897, at *2 (S.D. Ill. Dec. 3, 2012) (stating that it was "not aware of any specific guarantee under the First Amendment, or any other constitutional provision, that protects inmate hunger strikes," and further noting that the Seventh Circuit "frowned upon this type of coercive tactic.")).   The court concluded that the apparent conflict among the courts did not support a finding of a clear consensus on the issue as of the time the inmate plaintiff initiated his protest.   *Birdo*, 214 F. Supp. at 719 (citing *Cleveland–Perdue*, 881 F.2d at 431).

The Court's research does not reveal that by November 29, 2019, when Plaintiff engaged in hunger strike, the conflict among the courts described in *Birdo* had been resolved in favor of a finding recognizing prisoner hunger strike as a constitutional right under the First Amendment. *See, e.g.*, *Thomas v. May*, CV 21-708-RGA, 2024 WL 522576, at *3 (D. Del. Feb. 9, 2024) (collecting cases from 1998 to 2023 concluding that hunger strikes are, or are not, protected by the First Amendment, and holding that as of the plaintiff's "hunger strike in 2021, such a right had not been clearly recognized").   Finally, the split among the courts further shows that this case does not present a patently obvious constitutional violation that would release Plaintiff from his duty to present the court with analogous cases showing a clearly established constitutional right.   For the reasons set forth above, at the time of Plaintiff's alleged deprivation, prisoner hunger strike was not a clearly established expressive conducted protected under the First Amendment.

Accordingly, Defendants are entitled to summary judgment on Counts 2 and 3 on the basis of qualified immunity.

**Count 4:**    ***Fourteenth Amendment due process claim against Crawford, Brookhart, Young, Williams, and Mayberry for their participation in sham disciplinary proceedings.***

An inmate who raises a due process claim for a disciplinary proceeding must demonstrate first, a deprivation of a liberty interest and, second, that "the procedures he was afforded were constitutionally deficient."   *Lisle v. Welborn*, 933 F.3d 705, 720 (7th Cir. 2019) (citation omitted). Here, Defendants challenge both prongs of Plaintiff's due process claim.

**Deprivation of a liberty interest**

Placement of an inmate in disciplinary segregation can potentially trigger due process protections as long it imposes "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."   *Lisle*, 933 F.3d at 721.   This is a factual inquiry that depends on the "combined import" of the duration and conditions of the segregation.   *Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th Cir. 2013) (quotation omitted).   Absent exceptionally harsh conditions, relatively short terms of segregation will rarely amount to a deprivation of an inmate's liberty right.   *Basemore v. Brookman*, 16-CV-562-SMY-RJD, 2018 WL 1366587, at *2 (S.D. Ill. Mar. 16, 2018) (citing *Marion v. Columbia Correction Inst.*, 559 F.3d 693, 697–98 (7th Cir. 2009) (citing omitted); *see also* (*Brand v. Toennies*, 23-1723, 2024 WL 175948, at *1 (7th Cir. Jan. 17, 2024) (two months' C-grade status, one month segregation, and a disciplinary transfer did not raise due process concerns under governing case law); *Wilkinson v. Austin*, 545 U.S. 209, 221–24 (2005) (liberty interest in avoiding only those transfers that impose atypical or significant hardships). While the Seventh Circuit has noted that six months in segregation, standing alone, is insufficient to trigger due process rights, *Marion,* 559 F.3d at 698, it has also cautioned that "[s]ix months is

not an apt presumptive minimum for establishing a violation," and has urged the courts to not disregard the potential psychological impact that even short-term segregation may have on inmates. *Kervin v. Barnes*, 787 F.3d 833, 837 (7th Cir. 2015) (ultimately affirming dismissal for failure to state a claim where the prisoner did "not allege that he suffered any significant psychological or other injury" from his 30-day segregation confinement).

More relevant to the current procedural posture, in *Basemore*, the court found summary judgment inapposite where an inmate had spent nine months in segregation, during which he was unable to go to the yard to get air in the summer heat, was not provided sheets or cleaning supplies, there were feces on the walls and floors of his cells, the cells were infested with mold, insects and mice, and other inmates threw urine and feces and banged on the bars. *Basemore*, 16-CV-562-SMY-RJD, 2018 WL 1366587, at 2. The court noted that while "the record [was] not fully developed as to how certain conditions in segregation compared to general population conditions," there was sufficient evidence for a jury to reasonably conclude that the plaintiff's nine months in segregation posed an "atypical and significant hardship." *Id.* at 3.

Here, Defendants acknowledge that Plaintiff's sentencing to six (6) months in disciplinary segregation is sufficient to indicate a protectable liberty interest that triggers procedural due process safeguards. (Doc. 41 at 19). They rely, however, on *Morissette v. Peters*, 45 F.3d 1119, 1122 (7th Cir. 1995) to argue that Plaintiff did not, in fact, suffer a liberty deprivation because the Administrative Review Board expunged the disciplinary ticket (Doc. 41 at 19). They further argue that any time Plaintiff spent in segregation was the result of numerous other disciplinary tickets that he obtained prior to and after this particular ticket. (Doc. 41 at 19).

It is true that the administrative process "is part of the due process afforded prisoners," and,

thus, prisoners cannot prevail on a due process violation claim "when the error is corrected during the administrative appeal." *Brand v. Toennies*, 23-1723, 2024 WL 175948, at *1(quoting *Morissette*, 45 F.3d at 1122 (7th Cir. 1995); *Frank v. Schultz*, 808 F.3d 762, 764 (9th Cir. 2015) (internal quotations omitted)).   In *Morissette*, an inmate brought a due process claim because he was erroneously charged with possession of marijuana as "dangerous contraband," which charge was later reversed by the ARB on the basis that marijuana did not qualify as dangerous contraband. *Morissette*, 45 F.3d at 1121-22.   The Seventh Circuit reversed the magistrate judge's finding of a due process violation, holding that ARB's reversal of the erroneous charge cured any prior procedural error.  *Id.*   Importantly, the court noted that any extra days the inmate served as a result of the erroneous disciplinary ticket were credited to subsequent sentences for different offenses so that the inmate did not serve any additional time in segregation due to the erroneous disciplinary action.  *Id.*

Unlike *Morissette*, here, a review of the record shows, at least, a genuine dispute as to whether Plaintiff served additional time in segregation due to the erroneous disciplinary action. Based on the disciplinary ticket, on December 10, 2019, the Adjustment Committee issued the following final disciplinary actions for Plaintiff's participation in the orchestrated hunger strike: Six (6) Months C-Grade Designation; Six (6) Months Segregation; A Disciplinary Transfer; and Six (6) Months Contact Visits Restriction.   (Doc. 43-1 at 245-246).   Plaintiff testified that, as a result of the hunger strike disciplinary ticket, in early January 2020, he was transferred to Pontiac, a maximum-security prison, where he stayed in segregation for a period of six to eight months. (Doc. 41-1, 20).   He was also downgraded to C grade, which restricted access to hygiene only once a month and resulted in further restrictions on commissary and the use of the phone.   (*Id.*).

While in segregation, Plaintiff testified that his mental health deteriorated.   (Doc. 41-1, 21).   He was sleep deprived, he had "feces throw[n] in [his] face," became suicidal, and was on crisis watch. (*Id.*).   While the ticket was expunged from his record on July 21, 2020, Plaintiff testified that by that time, he was already transferred to Pontiac, and had already served his full sentence imposed for the hunger strike disciplinary ticket, including the visitation restrictions.   (*Id.*).   Drawing all reasonable inferences in the light most favorable to Plaintiff, a jury could reasonably conclude not only that Plaintiff's six months in segregation at Pontiac posed an atypical and significant hardship but also that at least part of Plaintiff's segregation term was due to the erroneous disciplinary ticket. Defendants' general citation to Plaintiff's Disciplinary History report arguing that Plaintiff's transfer to Pontiac and the six to eight months term of segregation was not, even in part, a disciplinary action for the later expunged ticket, at most, creates a genuine dispute on this material issue, precluding summary judgment.

**Violation of Due Process Safeguards**

In order to satisfy the Due Process Clause, an inmate must be given advance written notice of the disciplinary charge, the right to appear before an impartial hearing panel, the right to call witnesses if prison safety allows, and a written statement of the reasons for the discipline imposed. *Wolff v. McDonnell,* 418 U.S. 539, 563–69 (1974).   In addition, the disciplinary decision must be supported by "some evidence."   *Black v. Lane,* 22 F.3d 1395, 1402 (7th Cir. 1994).   Further, prisoners are entitled to be free from arbitrary actions of prison officials, including the manufacturing of evidence in bad faith to impose unwarranted sanctions on prisoners.   *Hanrahan v. Lane*, 747 F.2d 1137, 1141 (7th Cir. 1984) (citation omitted).   Compliance with the due process safeguards outlined in *Wolff*, however, provides sufficient protection against such arbitrary action,

thus barring an inmate's due process claim on the mere basis of a correctional officer's false reports.   *Id.*

Defendants argue that Plaintiff was afforded sufficient due process because Defendants complied with the *Wolf* procedural safeguards and the disciplinary decision was at least supported by some evidence.   (Doc. 41 at 17).   Plaintiff's deposition, however, casts doubt on two procedural safeguards: the impartiality of the adjustment committee and the opportunity to call witnesses.

*Right to call witnesses*

Plaintiff testified that when the erroneous disciplinary ticket was delivered to him, the correctional officer did not provide him with any writing utensils to list his requested witnesses. Plaintiff verbally requested to the correctional officers two witnesses, Defendant Gibbs, to whom Plaintiff allegedly had reported that he initiated his hunger strike due to the death of his grand-aunt, and his cellmate, who was present during Plaintiff's reporting of the hunger strike to Defendant Gibbs.   The correctional officer responded that Defendant's Gibbs's testimony would not be called because they already had his statement.   Defendants do not dispute that no witnesses were called at the hearing on Plaintiff's behalf, but they argue that this was due to Plaintiff's decision not to call any.   (Doc. 41 at 17).

It is true that "[f]ailure to call witnesses on behalf of a prisoner facing disciplinary action may be the foundation for a due process claim."   *Lloyd v. Roeckeman*, 15-CV-1021-NJR, 2015 WL 5955534, at *2–3 (S.D. Ill. Oct. 14, 2015) (citation omitted).   However, Plaintiff has not identified the correctional officer who delivered him the disciplinary ticket and who is responsible for not honoring Plaintiff's verbal request for witnesses.   (Doc. 41-1 at 71:4-8).   Because there is

no respondeat superior liability under Section 1983 and Plaintiff has failed to provide any evidence implicating any of the named Defendants in failing to honor his request for witnesses, Plaintiff cannot prevail in Count 4 on that basis.   *Sanville*, 266 F.3d at 740.

*Impartiality of the Adjustment Committee*

"Adjudicators enjoy a presumption of honesty and integrity, and thus the constitutional standard for impermissible bias is high." *Zimmerman v. Hanks*, 248 F.3d 1162 (7th Cir. 2000)  (citation omitted).   However, this presumption is rebutted when "an officer is substantially involved in the investigation of the charges against an inmate."   *Whitford v. Boglino*, 63 F.3d 527, 534 (7th Cir. 1995) (citation omitted).   Here, Plaintiff asserted in the Complaint that Defendants Young and Brookhart were "creating an incident report to make it appear as if he and five other inmates had gone on a hunger strike together."   (Doc. 13, at 11-12);   He further asserted that Defendants Williams and Mayberry were following the instructions by Defendant Brookhart and did not conduct an impartial hearing.   However, at summary judgment, Plaintiff cannot merely rely on the allegations in the complaint.

Reviewing Plaintiff's deposition, it appears that there is some evidence from which a reasonable jury could infer Defendant Brookhart's interference with the issuance of the disciplinary ticket and hearing, which could cast doubt on Defendants Williams and Mayberry's impartiality.   Plaintiff testified that Defendants Mayberry and Williams found him guilty, relying on Defendant Young's investigative report.   (Doc. 41-1 at 87:12-88:2).   He further testified that Defendant Mayberry told him that "the warden went on with everybody involved in this" and "they want this to happen and this is what they're going to make sure happens."   Drawing all reasonable inferences in Plaintiff's favor, Plaintiff's testimony could support a finding of Defendant

Brookhart's interference with Defendant Young's investigation and Defendants Mayberry and Williams's decisions at the disciplinary hearing, which could possibly deprive Plaintiff of his right to an impartial decision-maker.   *See e.g.*, *Blackman v. Butler*, 3:16-CV-1152-NJR-GCS, 2019 WL 8064036, at *9 (S.D. Ill. Aug. 29, 2019), *report and recommendation adopted*, 316CV01152NJRGCS, 2019 WL 6696294 (S.D. Ill. Dec. 9, 2019) (finding summary judgment inapposite where the record showed that the Chief Administrative Officer "advised the adjustment committee to impose an increased disciplinary sanction"); *Young v. Breeding*, 929 F. Supp. 1103, 1108 (N.D. Ill. 1996) (finding that an inmate had stated a due process claim against the warden who allegedly ordered the inmate's transfer to the psychiatric center without receiving a hearing before a neutral decision maker).   Accordingly, summary judgment in favor of Defendants Brookhart, Mayberry, Williams, and Young is not appropriate.

However, Plaintiff has failed to provide any evidence that Defendant Crawford was in any way involved in any deprivation of his due process rights following the issuance of the disciplinary ticket.   Because a defendant must be "personally responsible for the deprivation of a constitutional right," Defendant Crawford is entitled to summary judgment on Count 4 of the Complaint.   *See Sanville*, 266 F.3d at 740.

**Qualified Immunity**

Defendants also move for summary judgment on Plaintiff's due process claim on the alternative theory that they are entitled to qualified immunity because Defendants' conduct does not amount to a constitutional violation.   As set forth above, with the exception of Defendant Crawford, there are material facts in dispute that prevent a determination of the constitutionality of Defendants' conduct at this stage.   Further, while not briefed by the Defendants, there is

considerable case law supporting the contention that six months of disciplinary segregation could implicate a liberty interest for a prisoner when the conditions of confinement are atypical and cause significant hardship on the inmate in relation to the ordinary incidents of prison life.  "Once a liberty interest is implicated, it is clear that a prisoner is entitled to due process."  *Blackman*, 3:16-CV-1152-NJR-GCS, 2019 WL 8064036, at *9.   Accordingly, Defendants cannot prevail on qualified immunity on Count 4 at this stage.

<u>Conclusion</u>

Based on the foregoing, Defendants' Motion for Summary Judgment (Doc. 40) is **GRANTED in part and DENIED in part**.  Count 1 against Defendants Gibbs and Crawford, Count 2 against Defendants Crawford, Brookhart, and Young, and Count 3 against Defendants Williams and Mayberry are **DISMISSED WITH PREJUDICE**. Count 4 of the Complaint is **DISMISSED with PREJUDICE** as to Defendant Crawford but survives summary judgment as to Defendants Young, Brookhart, Mayberry, and Williams.   Defendants Gibbs and Crawford are **DISMISSED WITH PREJUDICE** from the case, and the Clerk of Court is **DIRECTED** to enter judgment accordingly at the close of the case.


**IT IS SO ORDERED.**

**DATED: March 28, 2024**


*s/  Reona J. Daly*
**Hon. Reona J. Daly**
**United States Magistrate Judge**